IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

SECURITIES AND EXCHANGE COMMISSION,

　　　　　　　　　Plaintiff,

v.

JOHN C. CHARTERS,

　　　　　　　　　Defendant.

---

## COMPLAINT

---

Plaintiff Securities and Exchange Commission ("Commission"), for its complaint, alleges:

### SUMMARY OF THE ACTION

1.　　During the second and third quarters of 2002, Defendant John C. Charters, a former executive of Expanets, Inc. ("Expanets"), a former subsidiary of NorthWestern Corporation ("NorthWestern"), and NorthWestern senior executives misled investors about Expanets' financial performance and the nature of Expanets' reported income.

2.　　First, with the knowledge of Charters and NorthWestern senior executives, Expanets failed to properly adjust its financial statements to account for uncollectible receivables and adjustments to customer bills, causing overstatements of NorthWestern's reported income of 90% and 109% in the second and third quarters of 2002, respectively.

3.　　Second, while Charters and NorthWestern senior executives publicly claimed that Expanets had achieved profitability through its operations and cost savings, they failed to properly disclose that Expanets' reported income during 2002 was, in large

part, derived from the reduction of various reserve accounts, which helped Expanets reach its earnings targets, and from its receipt of unusual non-compete payments.

4.     The conduct of Charters and NorthWestern senior executives helped facilitate NorthWestern's completion of more than $800 million in securities offerings in September and October 2002, including raising $87.5 million in an equity offering that provided the company with operating capital to improve its liquidity position.

5.     Approximately a year after these offerings, and after restating its 2002 quarterly financial results, writing off significant investments in Expanets, and disclosing the true results of its 2002 operations, NorthWestern declared bankruptcy.

## II.  JURISDICTION AND VENUE

6.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Sections 21(d) and (e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and (e)] for an order permanently restraining and enjoining Defendant and granting other equitable relief.

7.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].

8.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act [15 U.S.C. §§ 77v(a) and 78aa].

9.     In connection with the transactions, acts, practices, and courses of business described in this Complaint, Charters, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, of the facilities of a national

securities exchange, and/or of the means and instruments of transportation or communication in interstate commerce.

10.   Certain of the transactions, acts, practices and courses of business constituting the violations of law alleged herein occurred within this judicial district. Moreover, Defendant Charters resides in this judicial district.

### III.  DEFENDANT

11.   **John C. Charters**, age 45, is a resident of Carbondale, Colorado.  Charters was the chief executive officer ("CEO") of NorthWestern Growth Corporation ("NGC"), the division of NorthWestern that managed Expanets, from April through August 2002, and CEO of Expanets from August 2002 through July 2003.  From April 2002 through July 2003, Charters was also a member of Expanets' board of directors.  Prior to his position with Expanets, Charters was a member of NorthWestern's board of directors from February 2000 through April 2002.  Through his roles as CEO of both NGC and Expanets, Charters served as the functional head of Expanets.

### IV.  RELATED PARTIES

12.   **NorthWestern Corporation**, a Delaware corporation with its principal executive offices in Sioux Falls, South Dakota, operates a regulated utility business in South Dakota, Nebraska and Montana.  During the period described herein, NorthWestern controlled and consolidated the financial results of Expanets. NorthWestern's common stock was registered with the Commission under Section 12(b) of the Exchange Act and traded on the New York Stock Exchange until it was delisted shortly before NorthWestern declared bankruptcy in September 2003.  In November 2004, NorthWestern emerged from bankruptcy.  Its common stock is now registered with

the Commission pursuant to Section 12(b) of the Exchange Act and trades on the

NASDAQ Global Select Market.

13. **Expanets, Inc.**, a Delaware corporation formerly headquartered in

Englewood, Colorado, provided networked telecommunications equipment and services

to medium-sized businesses nationwide.  Expanets was comprised of approximately 26

small telecommunications equipment resellers and a former sales division of Lucent

Technologies.  NorthWestern wrote off substantially all of its investment in Expanets in

its 2002 Form 10-K and announced its intent to sell Expanets in April 2003.  In the

second quarter of 2003, Expanets' operations were discontinued, and in May 2004,

Expanets filed for bankruptcy.  Proceeds from the sale of Expanets' assets were

distributed in bankruptcy.

## V.    SUMMARY OF VIOLATIONS AND RELIEF SOUGHT

14.    Defendant Charters violated Section 17(a) of the Securities Act [15 U.S.C. §

77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and

78m(b)(5)] and Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5 and

240.13b2-1], and aided and abetted NorthWestern's violations of Sections 13(a),

13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A)

and 78m(b)(2)(B)] and Rules 12b-20, 13a-11 and 13a-13 thereunder [17 C.F.R. §§

240.12b-20, 240.13a-11 and 240.13a-13], and unless restrained and enjoined will violate

or aid and abet violations of such provisions.

15.    The Commission also seeks an order requiring Charters to pay a $50,000

civil penalty, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and

Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

# VI.    FACTS

### A.    Background -- NorthWestern's Expansion And The Poor Performance Of Expanets Prior To 2002

16.    For more than seventy years, NorthWestern operated a public utility business, providing electricity and natural gas to customers in South Dakota and Nebraska.

17.    In the late-1990s, NorthWestern formed Expanets to diversify into the potentially high-growth sector of telecommunications.  NorthWestern intended to acquire telecommunications companies and then make the combined businesses more profitable.

18.    NorthWestern expected that following an initial growth phase, Expanets would provide substantial additional earnings and cash flow to NorthWestern through dividends on NorthWestern's preferred stock holdings in Expanets.

19.    However, despite NorthWestern's investment of hundreds of millions of dollars in Expanets, it incurred large losses in most years and posted only small profits in other years.  By December 31, 2001, NorthWestern had invested $314.1 million in Expanets.  Despite this sizeable investment, Expanets had not returned significant cash to NorthWestern.

20.    Despite the historical poor performance of Expanets and another non-utility subsidiary, in February 2002, NorthWestern quadrupled its customer base for utility operations by acquiring Montana Power Company ("Montana Power") for approximately $1.1 billion.  NorthWestern financed a substantial part of this acquisition by issuing $720 million in unregistered notes.

**B.** **NorthWestern's Planned Equity Offering and Heightened Pressure to Meet Financial Performance Targets During 2002**

21.   NorthWestern's markedly increased debt used to acquire Montana Power threatened the company's historically stable liquidity and top-tier credit ratings. Therefore, in early February 2002, NorthWestern publicly announced its intention to conduct an equity offering, and then use the proceeds to pay down a portion of its elevated debt.

22.   During the second and third quarters of 2002, Charters and NorthWestern senior executives knew that the historical poor performance of Expanets and NorthWestern's expansion of its utility operations together placed enormous pressure on the company's financial performance during those periods.

23.   Charters and NorthWestern senior executives also knew that NorthWestern's ability to meet its public earnings per share guidance for 2002 was dependent in part upon achieving markedly increased profitability at Expanets.

24.   During the second and third quarters of 2002, Charters knew that Expanets' improved profitability was dependent in part on the functionality of Expanets' "EXPERT" information technology system, which had been implemented in late November 2001 to serve as a platform for virtually all of Expanets' operations, including sales, inventory, project management, billings, collections and financial statement preparation.

25.   However, during the second and third quarters of 2002, Charters knew that the EXPERT system was unable to perform many of the basic tasks for which it had been designed.  The EXPERT system experienced particularly severe problems in generating timely and accurate customer bills and tracking customer payments.

26.   Throughout the second and third quarters of 2002, Charters and NorthWestern senior executives received detailed information regarding serious, ongoing problems with the EXPERT system and its impacts across Expanets' operations, particularly as to customer billings and collections.  At various times during the second and third quarters of 2002, Charters and NorthWestern senior executives received weekly EXPERT updates, monthly operations reports and numerous candid emails regarding the system status.  During this time, Charters and NorthWestern senior executives also participated in regular meetings regarding ongoing system problems and planned repairs.

27.   As alleged below, Charters and NorthWestern senior executives also discussed throughout the second and third quarters of 2002 the impact of EXPERT problems on Expanets' accounts receivable collections and adjustments to customer bills.

28.   Prior to the completion of more than $800 million in securities offerings by NorthWestern in September and October 2002, Charters and NorthWestern senior executives told the marketplace that Expanets was operating as expected and was achieving its earnings targets.

29.   However, just two months later, in December 2002, NorthWestern disclosed that Expanets would take more than $50 million of charges for uncollectible accounts receivable and adjustments to customer bills.

30.   In April 2003, NorthWestern restated its Forms 10-Q for the first three quarters of 2002 and erased Expanets' previously reported income.  The company also disclosed significant ongoing problems with the EXPERT system, and the impact of various reserve reductions and unusual non-compete payments on Expanets' 2002 financial results.

31.   Also in April 2003, NorthWestern filed its 2002 Form 10-K, in which it wrote off substantially all of its past investment of hundreds of millions of dollars in Expanets.  In that filing, NorthWestern also announced that, despite past assurances, Expanets would not generate future cash flow in sufficient amounts to help service NorthWestern's debt.

32.   Over the next five months, NorthWestern's liquidity situation continued to deteriorate until the company declared bankruptcy in September 2003.

**C.**   **Charters' Role at Expanets**

33.   In Charters' roles as CEO of NGC and of Expanets, Charters oversaw and managed all of Expanets' operations.

34.   Throughout his tenure managing Expanets, Charters knew that Expanets' financial statements were consolidated into NorthWestern's published financial statements.  Charters also knew or was reckless in not knowing that NorthWestern's Forms 10-Q for the periods ended June 30, 2002 and September 30, 2002, and NorthWestern's earnings releases for those periods attached to Forms 8-K, included the misstated financial results of Expanets as further alleged herein.  Charters further knew or was reckless in not knowing that NorthWestern's Form 10-Q for the period ended June 30, 2002 was incorporated by reference into the amended Forms S-4 filed with the Commission on August 16, 2002 and September 9, 2002, as well as the equity offering prospectus supplements that NorthWestern filed with the Commission on September 30, 2002 and October 3, 2002.

35.   Charters spoke in NorthWestern's analyst conference call on August 8, 2002.

36.   Charters reviewed and approved portions of NorthWestern's Form 10-Q for the period ended September 30, 2002 regarding Expanets' operations and results. Charters was a member of NorthWestern's internally-created disclosure committee that was designed to ensure compliance with the Sarbanes-Oxley Act and to support the certification of NorthWestern's Form 10-Q for the period ended September 30, 2002 by NorthWestern's CEO and chief financial officer.

**D.**       **Expanets' Material Understatement Of Its Bad Debt Reserve**

37.   In anticipation that some customer accounts might prove uncollectible, Expanets maintained a "bad debt" reserve, which had the effect of reducing Expanets' operating income.

38.   In the second quarter of 2002, Charters was informed that Expanets had failed to increase its bad debt reserve to account for the markedly increased difficulties with collections that resulted from the EXPERT implementation.  For example, Charters knew or was reckless in not knowing that Expanets had not increased reserves to account for millions of dollars of aged receivables that pre-dated implementation of the EXPERT system in November 2001.  Charters also knew or was reckless in not knowing that after EXPERT implementation, a litany of system problems was greatly hampering collection, causing millions of dollars of receivables to become badly aged and therefore likely uncollectible.

39.   Charters therefore knew or was reckless in not knowing that Expanets improperly failed to increase its bad debt reserve to account for additional uncollectible accounts receivables in its financial statements for the second quarter of 2002.

40.   Charters knew or was reckless in not knowing that serious problems with Expanets' collections of its accounts receivables continued throughout the third quarter of 2002.  For example, in mid-September 2002, approximately two weeks before NorthWestern's equity offering, Charters and other Expanets personnel met with NorthWestern senior executives to discuss Expanets' accounts receivables.  At that meeting, Charters and NorthWestern senior executives were provided a written report and told by Expanets personnel that $52 million of receivables were over 180 days old, including $21 million of receivables that were over 300 days old.

41.   Because these severely aged receivables were not likely to be collected, standard collection parameters suggested either writing off Expanets' receivables or increasing its bad debt reserve by $46 million.  Because many of Expanets' aged receivables resulted from billing lapses and delays, Expanets personnel informed Charters and NorthWestern senior executives that the bad debt reserve was understated by a lesser amount, approximately $32 million.  However, Charters and NorthWestern senior executives knew that Expanets had not increased its reserve by any amount.

42.   On or about October 22, 2002, soon after the completion of NorthWestern's debt and equity offerings, Charters and other Expanets personnel met again with NorthWestern senior executives and informed them that Expanets' accounts receivables balance had shown virtually no improvement since the mid-September meeting.  Based upon this data, Expanets personnel recommended a substantial increase in Expanets' bad debt reserve.

43.  Despite his receipt of these documents, Charters and NorthWestern senior executives knew that Expanets did not increase its reserve as a result of the information exchanged at this meeting.

44.  After NorthWestern's securities offerings, the company's third quarter Form 10-Q disclosed in part that the EXPERT billing problems "*may* cause a need to increase the current reserve for bad debt, which *could* negatively impact financial performance in future quarters." (Emphases added)  Charters knew or was reckless in not knowing that this disclosure was false and misleading because, by that time, Expanets' bad debt reserve was, in fact, already materially understated.

45.  In April 2003, NorthWestern filed its 2002 Form 10-K which included fourth quarter 2002 charges of approximately $20 million relating to Expanets' uncollectible accounts receivable, and simultaneously restated its financial results for the second and third quarters of 2002, increasing Expanets' bad debt reserve for each of these periods by approximately $5.1 million and $6.3 million, respectively.

46.  As a result of its improper accounting for uncollectible accounts receivable, NorthWestern overstated its income from continuing operations by approximately 19% and 39% for the second and third quarters of 2002, respectively, as reported in its Forms 10-Q and corresponding earnings releases attached to Forms 8-K.  Moreover, in its segment reporting for Expanets, NorthWestern overstated Expanets' operating income by approximately 86% and 270%, respectively, for the second and third quarters of 2002.

**E.     Expanets' Material Understatement Of Its Reserve For Adjustments to Customer Bills**

47.  As a result of the inaccurate customer bills generated by the EXPERT system, Expanets issued partial credits to affected customers.  Expanets recorded these

credits as "billing adjustments," which reduced both its revenue and income in the current period.  Since Expanets credited customer accounts in periods after it initially recognized revenue from a transaction, Expanets maintained a "billing adjustment reserve" for anticipated credits to customer accounts.

48.   In the second and third quarters of 2002, Expanets personnel repeatedly informed Charters and NorthWestern senior executives that due to the serious ongoing problems with EXPERT's billing function, actual and forecasted billing adjustments were continuing to outpace even the elevated levels anticipated for 2002.

49.   During this time, Charters and NorthWestern senior executives received, among other things, monthly operations reports and other updates describing billing adjustments and their negative impact on Expanets' financial results.  For example, during a July 2002 meeting, Expanets personnel warned Charters and NorthWestern senior executives that Expanets' billing adjustment reserve might be understated by as much as $30 million for 2002.  Despite his knowledge of the inadequacy of this reserve, Charters approved a $2.3 million adjustment for the second quarter which further reduced the billing adjustment reserve, for the purpose of enhancing Expanets' reported income.

50.   In the third quarter of 2002, Expanets personnel informed Charters and NorthWestern senior executives that actual billing adjustments for the quarter had significantly exceeded their original and revised projections.  Despite this knowledge, Charters again approved a reduction in the billing adjustment reserve for the third quarter, this time for $4 million, for the purpose of enhancing Expanets' reported income.

51.   As a result of receiving this information throughout 2002, Charters knew or was reckless in not knowing that Expanets improperly failed to increase its billing

adjustment reserve in the second and third quarters of 2002.  Charters further knew or was reckless in not knowing that NorthWestern had not disclosed in its Form 10-Q for the third quarter of 2002 that losses resulting from billing adjustments were probable or reasonably possible.

52.   In April 2003, NorthWestern restated its financial results for the first three quarters of 2002, increasing the billing adjustment reserve by $33 million.  For the second and third quarters of 2002, NorthWestern's restated financial results corrected the understatement of Expanets' billing adjustment reserve by reducing reported quarterly revenue by approximately $10.1 million and $5.4 million, respectively.

53.   As a result of Expanets' improper accounting for billing adjustments, NorthWestern overstated its income from continuing operations by approximately 46% and 31% for the second and third quarters of 2002, respectively, as reported in its Forms 10-Q and corresponding earnings releases attached to Forms 8-K.  In its segment reporting for Expanets, NorthWestern overstated Expanets' operating income by approximately 1094% and 164%, respectively, for the second and third quarters of 2002.

**F.**   **Expanets' Reserve Reductions**

54.   During the second and third quarters of 2002, Expanets reduced amounts recorded in at least fourteen reserve accounts that it maintained on its balance sheet, the effect of which was to materially increase NorthWestern's and Expanets' reported income over that same period.  Charters knew or was reckless in not knowing about these reductions, their material impact on NorthWestern's and Expanets' results of operations, and NorthWestern's failure to properly disclose this information regarding Expanets' quality of earnings.

55.    From at least May 2002 through the filing of NorthWestern's Form 10-Q for the second quarter 2002, Charters informed NorthWestern senior executives through various communications, including emails, written reports and/or verbal communications, that Expanets planned to or had reduced its reserves during the second quarter, and that the result of such reductions would be used to increase Expanets' reported income.

56.    For purposes of the second quarter 2002 alone, approximately $8.8 million of Expanets' reported income was derived from reserve reductions.  This amount was material in that it represented approximately 80% of Expanets' reported segment operating income of $11 million and approximately 27% of NorthWestern's income from continuing operations for that quarter.

57.    Through his receipt of this information and communications with NorthWestern, Charters knew or was reckless in not knowing that a material portion of NorthWestern's and Expanets' reported results of operations for the second quarter 2002 was derived from Expanets' reserve reductions.

58.    However, during NorthWestern's August 2002 analyst call, Charters mischaracterized Expanets' financial position by stating that Expanets' profitability was based entirely upon permanent cost reduction measures without disclosing the material impacts of Expanets' reserve reductions.  This statement was misleading because Charters knew or was reckless in not knowing that Expanets' reported income for the second quarter had been materially impacted by various non-recurring reserve reductions, and thus was not representative of its true run rate.

59.    Throughout the third quarter of 2002, Charters continued to inform NorthWestern senior executives through emails, written reports and/or verbal

communications of Expanets' planned or actual reduction of reserves for the third quarter and the remainder of 2002.

60.    For example, during an operations review meeting between Expanets and NorthWestern senior management in October 2002 attended by Charters, Expanets personnel discussed with NorthWestern senior executives the possible reduction of $4.2 million of additional balance sheet reserves during the third quarter of 2002.  As a result, Expanets reduced its reserves by $4.2 million during the third quarter of 2002, thereby increasing NorthWestern's and Expanets' reported income.

61.    Approximately $27 million of Expanets' income was derived from reserve reductions during the third quarter of 2002.  With this income, Expanets was able to report $8.7 million of operating income rather than a substantial loss.  In addition, with this income, NorthWestern was able to report $14.6 million of income from continuing operations for that quarter rather than a loss.  Accordingly, the amount of Expanets' reserve reductions for the third quarter 2002 was material to both NorthWestern's and Expanets' results of operations for that period.

62.    Through his receipt of information from Expanets personnel and through his communications with NorthWestern, Charters knew or was reckless in not knowing that a material portion of NorthWestern's and Expanets' reported results of operations for the third quarter 2002 was derived from Expanets' reserve reductions.

63.    NorthWestern's Form 10-Q for the third quarter failed to properly disclose the material impact of Expanets' reserve reductions.  Charters knew or was reckless in not knowing about these material omissions from NorthWestern's Form 10-Q.

### G.   Expanets' Unusual Transactions

64.   In conjunction with Expanets' acquisition of certain assets of a competitor, Expanets agreed in March 2000 that, in exchange for payments from the competitor, Expanets would not solicit specific business of the competitor's customers.  Expanets' competitor was obligated to make these "non-compete" type of payments to Expanets until March 2005.  These payments were not characteristic of Expanets' regular operations and therefore represented unusual transactions.

65.   During the third quarter of 2002, Charters and NorthWestern senior executives knew that Expanets would be receiving these non-compete payments.  Furthermore, throughout the and third quarter of 2002, Expanets personnel informed NorthWestern senior executives through various communications, including emails, written reports and/or verbal communications, about the actual and projected impacts of these non-compete payments on Expanets' reported income for 2002.

66.   In the third quarter of 2002, NorthWestern reported in its segment disclosures that Expanets had operating income of approximately $8.7 million.  Approximately $15.3 million of Expanets' income came from the non-compete payments.  The $15.3 million also represented approximately 68% of NorthWestern's consolidated income from continuing operations for the quarter.  Accordingly, the amount of these non-compete payments was material to the operating results of both NorthWestern and Expanets for that period.

67.   NorthWestern's Form 10-Q for the third quarter of 2002 failed to properly disclose Expanets' receipt of these unusual non-compete payments and their material effect on Expanets' and NorthWestern's reported results of operations for that period.

68.   Through his receipt of information from Expanets accounting personnel and through his communications with NorthWestern during the third quarter of 2002, Charters knew or was reckless in not knowing about the material impact of these non-compete payments, and he knew or was reckless in not knowing that NorthWestern's Commission filing and corresponding earnings press release attached to Form 8-K for that period failed to properly disclose the impact to NorthWestern's and Expanets' reported results of operations.

### FIRST CLAIM FOR RELIEF
### (Violation of Section 17(a)(1) of the
### Securities Act [15 U.S.C. § 77q(a)(1)])

69.   Paragraphs 1 through 68 are hereby realleged and incorporated by reference.

70.   As a result of the foregoing, Charters directly and indirectly, with scienter, in the offer or sale of NorthWestern securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, has employed a device, scheme, or artifice to defraud.

71.   Charters thereby violated, and unless restrained and enjoined, will violate Section 17(a)(1) of the Securities Act.

### SECOND CLAIM FOR RELIEF
### (Violation of Sections 17(a)(2) and 17(a)(3)
### of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)])

72.   Paragraphs 1 through 68 are hereby realleged and incorporated by reference.

73.   Charters directly and indirectly, with scienter, in the offer or sale of NorthWestern securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, has obtained money or property by means of untrue statements of material fact or omissions to state material

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in transactions, practices, or courses of business which have been or are operating as a fraud or deceit upon the purchasers of NorthWestern securities.

74.   Charters violated, and unless restrained and enjoined, will violate Section 17(a)(2) and 17(a)(3) of the Securities Act.

### THIRD CLAIM FOR RELIEF
#### (Violation of Section 10(b) of the Exchange Act and Rule 10(b)(5) thereunder [15 U.S.C. §§ 78j(b) and §240.10b-5])

75.   Paragraphs 1 through 68 are hereby realleged and incorporated by reference.

76.   Charters directly and indirectly, with scienter, in connection with the purchase or sale of NorthWestern securities, by use of the means or instrumentalities of interstate commerce or by use of the mails, employed devices, schemes, or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices, or courses of business which had been and are operating as a fraud or deceit upon the purchasers or sellers of such securities.

77.   Charters violated, and unless restrained and enjoined, will violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### FOURTH CLAIM FOR RELIEF
#### (Violation of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1])

78.   Paragraphs 1 through 68 are hereby realleged and incorporated by reference.

79.   Charters knowingly failed to implement a system of internal accounting controls, and directly or indirectly falsified or caused to be falsified books, records or accounts described in Section 13(b)(2)(A) of the Exchange Act.

80.   Charters violated, and unless restrained and enjoined, will violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

**FIFTH CLAIM FOR RELIEF**
**(Aiding and Abetting NorthWestern's Violation of Section 13(a) of the**
**Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-11 and 13a-13 thereunder**
**[17 C.F.R. §§ 240.12b-20, 240.13a-11 and 240.13a-13])**

81.   Paragraphs 1 through 68 are hereby realleged and incorporated by reference.

82.   NorthWestern, an issuer of a security registered pursuant to Section 12(b) of the Exchange Act, filed materially misleading quarterly and current reports with the Commission.

83.   By reason of the foregoing, NorthWestern violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-11 and 240.13a-13].

84.   Charters knew of NorthWestern's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-11 and 13a-13 thereunder and substantially assisted NorthWestern in committing these violations.

85.   Charters aided and abetted NorthWestern's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-11 and 13a-13 thereunder, and unless restrained and enjoined will continue to aid and abet violations of these provisions.

## SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting NorthWestern's Violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)])

86.     Paragraphs 1 through 68 are hereby realleged and incorporated by reference.

87.     NorthWestern failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets.

88.     By reason of the foregoing, NorthWestern violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

89.     Charters knew or was severely reckless in not knowing of NorthWestern's violations of Section 13(b)(2)(A) of the Exchange Act and substantially assisted NorthWestern in committing these violations.

90.     Charters aided and abetted NorthWestern's violations of Section 13(b)(2)(A) of the Exchange Act, and unless restrained and enjoined will continue to aid and abet violations of these provisions.

## SEVENTH CLAIM FOR RELIEF
### (Aiding and Abetting NorthWestern's Violation of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)])

91.     Paragraphs 1 through 68 are hereby realleged and incorporated by reference.

92.     NorthWestern failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with

generally accepted accounting principles or any other criteria applicable to such statements and to maintain accountability for assets.

93.     By reason of the foregoing, NorthWestern violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

94.     Charters knew or was severely reckless in not knowing of NorthWestern's violations of Section 13(b)(2)(B) of the Exchange Act and substantially assisted NorthWestern in committing these violations.

95.     Charters aided and abetted NorthWestern's violations of Section 13(b)(2)(B) of the Exchange Act, and unless restrained and enjoined will continue to aid and abet violations of these provisions.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Find that Charters committed the violations alleged.

### II.

Enter an Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Charters from violating, directly or indirectly, the provisions of law and rules alleged in this complaint.

### III.

Issue an Order requiring Charters to pay a $50,000 civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

**IV.**

Grant such other relief as this Court may deem just or appropriate.


Dated:  July 23, 2007_____


Respectfully submitted,


s/ Kurt L. Gottschall_____
ELIZABETH ESPINOSA KRUPA
KURT L. GOTTSCHALL
NOEL M. FRANKLIN
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, CO  80202
Phone: (303) 844-1000
Fax: (303) 844-1052